File Date: December 5, 2022
Case Number: 22-cr-409 (S-1) (HG)

AAS:JAM
F. #2021R01110

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

YEVGENIY GRININ,
ALEKSEY IPPOLITOV,
BORIS LIVSHITS,
SVETLANA SKVORTSOVA,
VADIM KONOSHCHENOK,
ALEXEY BRAYMAN and
VADIM YERMOLENKO,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

> A TRUE COPY
> ATTEST
> DATE _December 5_ 20 _22_
> BRENNA B. MAHONEY
> BY _____ CLERK
> _____ DEPUTY CLERK

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 22-409 (S-1) (HG)
(T. 13, U.S.C., § 305(a)(1); T. 18,
U.S.C., §§ 371, 554, 981(a)(1)(C),
982(a)(1), 982(a)(2), 982(b)(1), 1343,
1349, 1956(h), 1957(a), 1957(b),
1957(d)(1), 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c); T. 50, U.S.C., §§ 4819(a)(1),
4819(a)(2)(A)-(G), 4819(b),
4819(d)(1), 4819(d)(2), 1705(a) and
1705(c); T. 15, C.F.R., §§ 736.2(b)(1)
and 746.8(a)(1))

THE GRAND JURY CHARGES:

<u>INTRODUCTION</u>

At all times relevant to this Superseding Indictment, unless otherwise

indicated:

I.    <u>The Serniya Procurement Network</u>

    1.    OOO[1] Serniya Engineering ("Serniya") was a wholesale machinery

and equipment company based in Moscow, Russia.   Serniya headed an illicit procurement

network operating under the direction of Russia's intelligence services (collectively, the

---

[1]    "OOO" is the abbreviation for the Russian business entity type, "общество с
ограниченной ответственностью," which means limited private company and is roughly
the equivalent of a limited liability company or LLC in the United States.

"Serniya Network"), which evaded U.S. and Western sanctions to acquire sensitive military grade and dual use technologies, including advanced semiconductors, for the Russian military, defense sector and research institutions.   The Serniya Network's clients included the following Russian companies and entities: State Corporation Rostec, the state-owned defense conglomerate; State Atomic Energy Corporation Rosatom ("Rosatom"); JSC Rusnano, the state-owned nanotechnology company; the National Research Nuclear University of the Moscow Engineering Physics Institute; the Ministry of Defense; the Foreign Intelligence Service ("SVR"); and various components of the Federal Security Service ("FSB"), Russia's principal security agency and the main successor agency to the Soviet Union's KGB, including the Department of Military Counterintelligence and the Directorate for Scientific and Technological Intelligence, commonly known as "Directorate T."

2.   OOO Sertal ("Sertal") was a wholesale machinery and equipment company based in Moscow, Russia.   As described herein, Sertal operated within the Serniya Network and in turn utilized a network of front companies, shell entities and bank accounts throughout the world, including in the United States, to source, purchase and ship export-controlled items from the U.S. to Russia.

3.   Sertal was an FSB-accredited contractor authorized to conduct highly sensitive and classified procurement activities.   In on about August 2020, Sertal obtained a renewal of its license from the FSB, allowing it to "carry out work related to the use of information constituting a state secret up to the top-secret level."[2]   In an August 31, 2020

---

[2]   Unless otherwise indicated, all quoted communications contained herein are translations of written or spoken Russian.

letter to the All-Russian Research Institute of Automation ("VNIIA"), a Rosatom subsidiary

that developed nuclear weapons and their components, Sertal's General Director confirmed

the reissuance of its FSB license, stating that, "since June 2016, Sertal LLC has successfully

performed and is performing work using information constituting a state secret . . . we

suggest that you further consider our company as a potential supplier of complex equipment,

devices and components."

        4.      On or about March 3, 2022, Serniya and Sertal were added to the U.S.

Department of Commerce ("DOC") Bureau of Industry and Security ("BIS") Entity List (the

"Entity List"), found at Title 15, Code of Federal Regulations, part 774, Supplement Number

4. The Entity List imposed additional license requirements and export restrictions due to a

determination that the entities included on the list had engaged in activities contrary to U.S.

national security or foreign policy interests.   BIS added Serniya and Sertal to the Entity List

because of their relationship to the Russian government and in response to Russia's invasion

of Ukraine beginning in February 2022.   Specifically, BIS indicated that Serniya, Sertal and

other entities were sanctioned because they "have been involved in, contributed to, or

otherwise supported the Russian security services, military and defense sectors, and military

and/or defense research and development efforts."   87 Fed. Reg. 13141.   BIS adopted a

"policy of denial" with respect to Serniya and Sertal, indicating that BIS would not authorize

a license to export items to Serniya or Sertal.

        5.      On or about March 31, 2022, pursuant to Executive Order 14024, the

U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated

Serniya, Sertal and several other entities in the Serniya Network and added them to the list of

Specially Designated Nationals and Blocked Persons (the "SDN List").   According to

OFAC's press release, the designation was part of "its crackdown on the Kremlin's sanctions

evasion networks and technology companies, which are instrumental to the Russian

Federation's war machine." OFAC described Serniya as:

> the center of a procurement network engaged in proliferation
> activities at the direction of Russian Intelligence Services. This
> network operates across multiple countries to obfuscate the
> Russian military and intelligence agency end-users that rely on
> critical western technology. Serniya and Moscow-based OOO
> Sertal work to illicitly procure dual-use equipment and
> technology for Russia's defense sector.

6.      OFAC also designated several individuals and companies operating in

the Serniya Network, including United Kingdom-based Majory LLP, United Kingdom-based

Photon Pro LLP, and Spain-based Invention Bridge SL, among others, identifying them as

"front companies utilized by Serniya to facilitate its procurement of key equipment for the

Government of the Russian Federation."

II.     The Defendants

7.      The defendant YEVGENIY GRININ was a Russian national who

resided in Russia. GRININ worked for Sertal as its Technical Director and was an

executive officer of Photon Pro LLP, a front company used by the Serniya Network. On or

about March 9, 2022, BIS added Photon Pro to the Entity List. On or about March 31, 2022,

pursuant to Executive Order 14024, OFAC added GRININ to its SDN List for "being a

leader, official, senior executive officer, or member of the board of directors of Photon Pro

LLP."

8.      The defendant ALEKSEY IPPOLITOV was a Russian national who

resided in Russia. IPPOLITOV was affiliated with the All-Russian Scientific Research

Institute of Electromechanics, a Moscow-based research institute and a subsidiary of

ROSCOSMOS, the Russian state space corporation, which developed satellites and military

spacecraft. IPPOLITOV was also affiliated with the All-Russian Research Institute for

Optical and Physical Measurements ("VNIIOFI"). VNIIOFI was added to the Entity List on

April 7, 2022.

9.     The defendant BORIS LIVSHITS was a Russian national who resided

in Russia and previously lived in Brooklyn, New York. LIVSHITS owned and/or controlled

several front companies that operated on behalf of the Serniya Network. These entities

conducted no actual business and were used to obfuscate the role of Russian or sanctioned

entities in transactions.

10.     The defendant SVETLANA SKOVORTSOVA was a Russian national

who resided in Russia. SKOVORTSOVA worked for Sertal as Advisor to the General

Director under the supervision of the defendant YEVGENIY GRININ.

11.     The defendant VADIM KONOSHCHENOK was a Russian national

who resided in Estonia.

12.     The defendant ALEXEY BRAYMAN was a lawful permanent resident

of the United States who resided in New Hampshire.

13.     The defendant VADIM YERMOLENKO was a United States citizen

who resided in New Jersey.

III.     The Statutory and Regulatory Background

    A.     The International Emergency Economic Powers Act and the
        Relevant Sanctions Orders and Regulations Relating to Russia

14.     The International Emergency Economic Powers Act ("IEEPA"),

codified at Title 50, United States Code, Sections 1701 through 1708, conferred upon the

President the authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provided, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

15.    In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to Russia's violation of the sovereignty of Ukraine by asserting authority over the Crimea region. To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria. These criteria included, but were not limited to, individuals determined to be responsible for or complicit in, or who engaged in, actions or policies that threaten the peace, security, stability, sovereignty or territorial integrity of Ukraine; or who materially assisted, sponsored or provided financial, material or technological support for, or goods or services to, individuals or entities engaging in such activities. Executive Order 13660 prohibited, among other things, transferring, paying, exporting, withdrawing and otherwise dealing in any interest in property in the United States owned by a person whose property and interests in property were blocked (a "blocked person"), as well as the making of any contribution or provision of funds, goods or services by a United States person to or for the benefit of a blocked person and the receipt of any contribution or provision of funds, goods or services by a United States person from any such blocked person.

16.    The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine remained in continuous effect since 2014 and was renewed on March 2, 2022, following Russia's most recent invasion of Ukraine.

17.    On multiple occasions, the President expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addressed the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addressed the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine.   Executive Orders 13660, 13661 and 13662 were collectively referred to as the "Ukraine-Related Executive Orders."   On February 21, 2022, the President again expanded the scope of the national emergency, finding that the Russian Federation's purported recognition of the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine contradicted Russia's commitments under the Minsk agreements and threatened the peace, stability, sovereignty and territorial integrity of Ukraine.

18.    The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as necessary to carry out the purposes of those orders.   The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the U.S. Government.

19.     To implement the Ukraine-Related Executive Orders, OFAC issued certain Ukraine-Related Sanctions Regulations.   These regulations incorporated by reference the prohibited transactions set forth in the Ukraine-Related Executive Orders.   See 31 C.F.R. § 589.201.   The regulations also provided that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests were therefore blocked, would be published in the Federal Register and incorporated into the SDN List, published on OFAC's website. Id. n.1.

B.     The Export Control Reform Act and Export Administration Regulations

20.     The Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, were promulgated by BIS to regulate the export of goods, technology and software from the United States.   Under the Export Control Reform Act ("ECRA"), it was a crime to violate, attempt to violate, conspire to violate or cause a violation of any regulation, order, license or authorization issued pursuant to the statute, including the EAR.   See 50 U.S.C. § 4819(a)(1).   Willful violations of the EAR constituted criminal offenses under the ECRA, and carried a 20-year maximum term of imprisonment and up to a $1,000,000 fine.   See 50 U.S.C. § 4819(b).

21.     Through the EAR, the BIS reviewed and controlled the export from the United States to foreign countries of certain U.S. items.   See 15 C.F.R. §§ 734.2-.3.   In particular, the BIS placed restrictions on the export and re-export of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.   Under the EAR, such restrictions depended on several factors, including the

technical characteristics of the item, the destination country, the end user and the end use of the item.

22.   The most sensitive items subject to the EAR controls were identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1.   Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use and end user of the item.

23.   The BIS published the names of certain foreign persons—including businesses, research institutions, government and private organizations, individuals and other types of legal persons—that were subject to specific license requirements for the export, reexport and/or transfer (in-country) of specified items.   These persons comprised the Entity List found at Title 15, Code of Federal Regulations, part 774, Supplement Number 4.   The persons on the Entity List were subject to individual licensing requirements and policies supplemental to those found elsewhere in the EAR, due to a determination that such persons had engaged in activities contrary to U.S. national security and/or foreign policy interests.

24.   In response to Russia's 2022 invasion of Ukraine, the DOC imposed new license requirements on exports to Russia.   As of February 24, 2022, any item classified under any ECCN in Categories 3 through 9 of the CCL required a license to be exported to Russia.   See 87 Fed. Reg. 12226 (Mar. 3, 2022).   As of April 8, 2022, the license requirement for export to Russia was expanded to cover all items on the CCL.   See 87 Fed. Reg. 22130 (Apr. 14, 2022).   These rules were codified in Title 15, Code of Federal Regulations, part 746.8, which stated, "a license is required, excluding deemed exports and deemed reexports, to export, reexport, or transfer (in-country) to or within Russia or Belarus

any item subject to the EAR and specified in any Export Control Classification Number (ECCN) on the CCL."

25.     Federal law required that any international shipment where a valid export license is required or where the commodity classified is over $2,500 be logged in the Automated Export System ("AES") via an Electronic Export Information ("EEI") filing. Failure to make an EEI filing or providing false or misleading information on an EEI filing in the AES was a violation of 13 U.S.C. § 305.

IV.     Overview of the Criminal Scheme

26.     Since at least 2017, the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS, SVETLANA SKVORTSOVA, VADIM KONOSHCHENOK, ALEXEY BRAYMAN, VADIM YERMOLENKO and their co-conspirators in the Serniya Network unlawfully sourced, purchased and shipped millions of dollars in military and sensitive dual-use technologies from U.S. manufacturers and vendors located in the Eastern District of New York and elsewhere (collectively, the "U.S. Companies") for Russian end users, in violation of IEEPA, ECRA and other U.S. criminal statutes.   These items included advanced electronics and sophisticated testing equipment used in quantum computing, hypersonic and nuclear weapons development and other military and space-based military applications.

27.     To effectuate the scheme, the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS, SVETLANA SKVORTSOVA, VADIM KONOSHCHENOK, ALEXEY BRAYMAN, VADIM YERMOLENKO and their co-conspirators made and caused to be made material misrepresentations and omissions, both orally and in writing, with respect to invoices, end use statements, financial records and

shipping documents, among other items, to conceal the nature of these illicit procurement

transactions.   By doing so, the defendants and their co-conspirators caused the U.S.

Companies to sell and export sensitive military and dual-use items in violation of IEEPA,

ECRA, and other U.S. laws and regulations; process and accept payments in furtherance of

such illicit transactions; and fail to file documents with the DOC, BIS and other U.S.

government entities, including license applications and required statements regarding the

ultimate consignee and purchaser.   The defendants and their co-conspirators also caused

U.S. financial institutions to process millions of dollar-based payments in violation of

IEEPA, ECRA and other U.S. laws and regulations.   Several of these transactions were

processed through correspondent accounts at New York City banks and within the Eastern

District of New York.

    28.  To purchase and export items from the U.S. Companies, the defendants

YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS, SVETLANA

SKVORTSOVA, VADIM KONOSHCHENOK, ALEXEY BRAYMAN, VADIM

YERMOLENKO and their co-conspirators in the Serniya Network routed and layered

transactions through a variety of front companies and bank accounts located in jurisdictions

throughout the world.   Specifically, items were shipped from the U.S. Companies to various

locations in the United States and Europe that corresponded to fictitious addresses registered

to shell companies controlled by the Serniya Network.   Items were repackaged and

reshipped to several intermediate locations in Europe and Asia before arriving in Russia.

Common transshipment points included locations in Estonia, Finland, Germany and Hong

Kong.   Payments were also layered, with money being transferred to accounts in the names

of shell companies held at different banks in jurisdictions throughout the world before

eventually arriving in Russia.   Additionally, shipping documents understated the value of the exports from the U.S. to avoid applicable reporting requirements, thereby avoiding additional scrutiny.   Accordingly, the defendants and their co-conspirators disguised the audit trail of shipments and payments and concealed the true Russian end users for items purchased from the U.S. Companies.

V.     The Defendants' Involvement in the Serniya Network

29.     The defendant ALEKSEY IPPOLITOV acted as a liaison between Serniya and Sertal on the one hand, and Russian end users in the defense and technology sectors on the other.   IPPOLITOV solicited orders from Russian end users who sought to acquire a particular item or part from the United States.   IPPOLITOV then relayed the request to employees at Sertal and Serniya, including the defendants YEVGENIY GRININ and SVETLANA SKVORTSOVA, who were tasked with procuring the desired component from the U.S. Companies.   IPPOLITOV oversaw the purchase and shipping of the items from the U.S. Companies through the Serniya Network's front companies and bank accounts.

30.     The defendants YEVGENIY GRININ and SVETLANA SKVORTSOVA decided how to fulfill orders placed by Russian end users, including those orders placed through the defendant ALEKSEY IPPOLITOV.   GRININ and SKVORTSOVA secured funding and shipping for the transactions, as well as assisted in preparing documents with false and misleading information in furtherance of the scheme. The fact that a specific item was subject to U.S. export controls and regulations was often apparent to the conspirators.   For example, in a July 25, 2019 email, a Serniya employee asked GRININ, "[C]an you help me obtain these items [high-performance pressure transducers] from the States?   These pressure transducers fall under export controls.   What

information will be needed from me?"    Similarly, a June 2020 email exchange between

GRININ, SKVORTSOVA and other Serniya and Sertal employees was titled "URGENT:

Important Announcement about US Export Regulation Changes" and specifically described

the definition of "military end-users."

   31. The defendants YEVGENIY GRININ and SVETLANA

SKVORTSOVA frequently tasked the defendant BORIS LIVSHITS to interface directly

with the U.S. Companies and purchase items requested by Russian end users.    In doing so,

GRININ, SKVORTSOVA and LIVSHITS discussed methods to evade U.S. export controls

and other criminal laws.    For example, in an email exchange on or about December 17,

2018, LIVSHITS opined to SKVORTSOVA that "complications with export [of an item

from the U.S.] will not be known until order."    After SKVORTSOVA asked for

clarification, LIVSHITS responded, "The same as usual—with export control and finding out

who the buyer and the final user and why it is bought, for what application. . . [a]s it was then

with the [prior transaction involving a part from a U.S. Company], it seemed harmless

purchase, [but still] took a month of correspondence with them."    Similarly, in an email on

or about March 15, 2022, after Serniya and Sertal were added to the BIS Entity List,

LIVSHITS wrote to SKVORTSOVA, "When ordering in the USA, the price is significantly

more expensive . . . [as well as] difficulties with export from there—[the item] is subject to

EAR."    In another instance, in response to an inquiry from a U.S. Company, LIVSHITS

asked GRININ to provide an explanation for how a particular item would be used and the

identity of the end user.    After GRININ responded with a technical explanation, LIVSHITS

sent an invoice falsely listing the end user as Strandway LLC, a front company controlled by

LIVSHITS, at an address in New York City.

32.    The defendant BORIS LIVSHITS also counseled breaking up larger orders to avoid detection by law enforcement.   For example, in response to a September 4, 2019 inquiry from the Physics Institute of the Russian Academy of Sciences ("FIAN"), the defendant ALEXEY IPPOLITOV emailed the defendant YEVGENIY GRININ about obtaining a "chip set" of 45 advanced semiconductors and other items from a Dallas-based technology company ("U.S. Company 1").   On September 4, 2019, IPPOLITOV forwarded a document from FIAN to GRININ titled "Foreign Equipment for FIAN."   GRININ, in turn, forwarded the document to the defendant SVETLANA SKVORTSOVA, and in a September 6, 2019 email, GRININ proposed tasking the defendant BORIS LIVSHITS with helping fulfill the order.   On September 6, 2019, after GRININ and SKVORTSOVA contacted LIVSHITS and requested a price quote, GRININ, SKVORTSOVA and LIVSHITS discussed the requested semiconductors and other comparable items.   In one email, LIVSHITS cautioned that the part required an export license and that "you need to buy such positions carefully, at 5-10 pieces at a time."

33.    In another example, in a July 16, 2020 email to the defendant SVETLANA SKVORTSOVA, LIVSHITS warned that "such a large and expensive order would draw unwanted attention and suspicion . . . break up the order into smaller orders over a time period."   LIVSHITS further advised that "the U.S. Department of Commerce Bureau of Industry and Security can cause problems and deny the shipment," and suggested that he could order the parts from his U.S. companies, as well as entities in Estonia and Finland, over a two- to three-week period.

34.    The defendant BORIS LIVSHITS, who spoke English, communicated with the U.S. Companies through in-person meetings, telephonic conversations and in email

and text exchanges. In those communications, LIVSHITS misrepresented and omitted material information, including information about how the item would be used, the various parties involved in the transaction, and the identity of the ultimate Russian end user.

35. For example, the defendant BORIS LIVSHITS often used the alias "David Wetzky" to communicate with the U.S. Companies to frustrate due diligence efforts by the U.S. Companies. In or about April and May 2022, after Serniya and Sertal were added to both the BIS Entity List and the SDN List, LIVSHITS used the alias to contact an Illinois-based electronics distributor ("U.S. Company 2") via email and inquire about purchasing a variety of dual-use oscilloscopes, including models that were controlled by the DOC under ECCN 3A992.a for reasons of anti-terrorism. In or about April 2022, U.S. Company 2 sold LIVSHITS one of these oscilloscopes for approximately $25,000; invoices and other records falsely listed "Strandway LLC" and "David Wetzky" as the purchaser and end user of the item. The item was shipped to an address in Merrimack, New Hampshire (the "New Hampshire Residence"), which was the home address of defendant ALEXEY BRAYMAN. On May 9, 2022, BRAYMAN shipped a package from the New Hampshire Residence to a location in Hamburg, Germany with the label reading "OSCILLOSCOPE – USED, NO WARR" and denoting the same make and model purchased from U.S. Company 2. The value of the item was falsely listed as $2,482.

36. The defendants ALEXEY BRAYMAN and VADIM YERMOLENKO assisted the defendant BORIS LIVSHITS in unlawfully exporting dual-use and controlled items from the United States. Specifically, YERMOLENKO shipped packages to BRAYMAN at the New Hampshire Residence, which was a frequent transshipment point for items that were unlawfully exported from the United States to Russia. For example,

regarding one shipment, LIVSHITS instructed YERMOLENKO, "We need to send DHL to Germany, to the same company" with the items' description falsely being listed as "Duffle bag size L -$300" and "Duffle bag size XL - $550." YERMOLENKO sent LIVSHITS a shipping invoice that YERMOLENKO had signed addressed to the New Hampshire Residence. LIVSHITS then forwarded the invoice to the defendants YEVGENIY GRININ and SVETLANA SKVORTSOVA.

37.   Additionally, while acting under the defendant BORIS LIVSHITS' direction, the defendants ALEXEY BRAYMAN and VADIM YERMOLENKO altered or destroyed shipping documents and other business records, as well as facilitated payments in furtherance of illicit transactions. For example, in a May 23, 2018 email to YERMOLENKO, LIVSHITS instructed "Before sending, you need to ask your people to open the box, take a picture and send it to me—the part itself, on both sides and the invoice that is attached. To be sure that they sent exactly what we ordered. Throw away the original invoice and DO NOT send it to Germany!" In another message from YERMOLENKO to LIVSHITS on October 29, 2018, an attached invoice from the U.S. branch of a Taiwanese technology conglomerate listed YERMOLENKO as the exporter from a New Jersey address and stated that the item was

> controlled by the U.S. Government and authorized for export only to
> the country of ultimate destination for use by the ultimate consignee or
> end-user(s) herein identified. They may not be resold, transferred, or
> otherwise disposed of, to any other country or to any person other than
> the authorized ultimate consignee or end-user(s), either in their original
> form or after being incorporated into other items, without first
> obtaining approval from the U.S. government or as otherwise
> authorized by U.S. law and regulations.

38.     Similarly, in a February 12, 2022 message, the defendant BORIS
LIVSHITS asked the defendant ALEXEY BRAYMAN to "take a photo of the contents for
me . . . and if there are financial paper there, remove them."   Later, in a March 10, 2022
communication, BRAYMAN and LIVSHITS discussed sending items to Russia through
Germany "by hook or by crook."   In another communication on May 10, 2022, BRAYMAN
asked LIVSHITS if he needed a "certificate of origin."   LIVSHITS responded, "You have to
get rid of this."   BRAYMAN confirmed, "I'm throwing it out."   More recently, in an
August 29, 2022 message, LIVSHITS asked BRAYMAN to forge a signature on an invoice,
saying "you have to write Tate Olsen and a squiggle, as if it's a signature."

39.     The defendant VADIM KONOSHCHENOK, while acting under the
direction of the defendant BORIS LIVSHITS, shipped or physically smuggled U.S.-origin
items from Estonia to Russia, including dual-use electronics and other export-controlled
items.   For example, on September 21, 2022, the defendant ALEXEY BRAYMAN sent a
package from the New Hampshire Residence to "Vadim Konoshchenok" at an address in
Tallinn, Estonia.   The invoice described the contents as a "Prototype Development Board
with Case," manufactured by a software company in Texas and controlled by the DOC under
ECCN 3A992.a.

VI.     Financial Transactions in Furtherance of the Scheme

40.     The defendant BORIS LIVSHITS established and managed numerous
shell companies in the United States, including entities in the Eastern District of New York.
Specifically, LIVSHITS used agents and nominees to create fictitious corporate entities and
obtain corresponding Employer Identification Numbers ("EIN") from the Internal Revenue
Service ("IRS").   In this manner, LIVSHITS created the following entities, several of which

were incorporated with addresses in the Eastern District of New York: Advanced Web

Services LLC; Crossgate LLC; Crosswell LLC; Divatek Trading Inc.; Fennica Networks

LLC; FF Networks LLC; JJ Networks LLC; Palmira Networks LLC; Palmira Systems LLC;

Speedray Solutions LLC; Strand Networks LLC; Strandaway LLC; Streen LLC; Trailgate

Systems LLC; WebForce Communications LLC; and Windwire Technologies LLC.

        41.    The defendant BORIS LIVSHITS paid agents and nominees to open

bank accounts at U.S. financial institutions in the names of these shell companies (the "U.S.

Bank Accounts"), including in the Eastern District of New York.   LIVSHITS retained

control over the shell entities and the corresponding U.S. Bank Accounts for use in the

Serniya Network.

        42.    The defendant VADIM YERMOLENKO obtained EINs and opened

numerous U.S. Bank Accounts for multiple shell companies.   YERMOLENKO managed the

accounts at the direction of the defendant BORIS LIVSHITS, including the following ways:

        (a)    In or about 2019, YERMOLENKO provided LIVSHITS with

YERMOLENKO's spouse's signature to use on IRS documents for company applications

and applications to open U.S. Bank Accounts.

        (b)    In an August 1, 2019 email to LIVSHITS, YERMOLENKO

stated, "[W]e need docs for all companies, tomorrow I'm going to open accounts."

LIVSHITS responded by sending a list of IRS, state and other official documents for four

shell entities, including Strand Networks LLC and Trailgate Systems LLC.

        (c)    In an email on August 5, 2019, YERMOLENKO provided

LIVSHITS with the account names, electronic logins, passwords and answers to the security

questions for the bank accounts of five different shell companies, including Strand Networks

LLC and Trailgate Systems LLC.  Notably, several invoices exchanged between the

defendant YEVGENIY GRININ and other members of the Serniya Network listed Strand

Networks LLC as the beneficiary.

        (d)    In a series of April 2022 emails, LIVSHITS instructed

YERMOLENKO as follows: "Here is the document of the new NJ LLC and EIN.  You can

open an account.  Let's start with [a major U.S. financial institution, hereinafter "Bank 1,"

an entity the identity of which is known to the Grand Jury]: If they open an account there,

then ask them if it is possible to have an account with access to their CEO Portal, where wire

functionality and double custody with 2 RSA tokens . . . and wire limits to at least $50k/wire

and $200-300k/months."  On April 26, 2022, YERMOLENKO opened an account in the

name of "JJ Networks LLC" at a Bank 1 branch in New Jersey.  The following day,

YERMOLENKO deposited a check for $44,400.84, and immediately transferred $9,353 to

Strandway LLC, and $34,000 to Trailgate Systems, LLC—two front companies created and

controlled by LIVSHITS—and withdrew the rest of the balance in cash.

        (e)    In an April 29, 2022 email, LIVSHITS instructed

YERMOLENKO, "You need to call, or, which would be better, go to [the bank] – you need

to find out why they won't send the outgoing wire transfer to Iceland from Strand Networks

LLC . . . if the bank asks what the payment is for – for bicycle spare parts, sporting goods

and textile products."  The email attached an invoice describing the cargo as deep-sea

navigation and communications equipment.

        (f)    In a June 15, 2022 message exchange, LIVSHITS asked the

defendant ALEXEY BRAYMAN, "Is it possible for you to send my Wells Fargo token via

Fedex to Vadik [YERMOLENKO] in NJ?"  After BRAYMAN confirmed, saying "yes, I

can send it. No problem," LIVSHITS sent YERMOLENKO's home address and asked
BRAYMAN to "send it today."

43.    Another agent ("Co-Conspirator 1"), an individual whose identity is
known to the Grand Jury, obtained an EIN from the IRS and opened an account at a bank
located in Sheepshead Bay, Brooklyn ("Bank 2"), a financial institution the identity of which
is known to the Grand Jury, in the name of Strandway LLC ("the Strandway LLC Account").
The Strandway LLC Account was initially funded by a payment from Advanced Web
Services, another entity controlled by the defendant BORIS LIVSHITS.   LIVSHITS used
funds from the U.S. Bank Accounts to pay for items purchased from the U.S. Companies, as
well as other expenses associated with the transactions.

44.    The defendants and their co-conspirators used the U.S. Bank Accounts,
including the Strandway LLC Account, to receive funding from accounts in various foreign
jurisdictions in the names of shell companies used in the Serniya Network, including Majory
LLP, Invention Bridge SL and Photon Pro LLP, all of which were added to the SDN List
pursuant to OFAC's March 31, 2022 designation.   Funds transferred from accounts in the
names of Majory LLP, Invention Bridge SL and Photon Pro LLP into the Strandway LLC
Account were often forwarded to and disbursed soon after their receipt—sometimes on the
same day—indicating that the defendant BORIS LIVSHITS was acting as an intermediary to
disguise the audit trail and obfuscate the origin, purpose and identities of Russian end users.
The following transactions involving the Strandway LLC Account at Bank 2 were in
furtherance of the scheme:

(a)     On September 13, 2018, the Strandway LLC Account received $43,900 from Majory LLP.   Within five days, $43,295 was disbursed to five different individuals and entities, including other accounts in the defendant BORIS LIVSHITS' name.

(b)     On January 4, 2019, the Strandway LLC Account received $18,300 from Majory LLP.   By January 7, 2019, $18,158 had been disbursed, with one payment to a Florida-based spectroscopy company, and two payments totaling $8,450 to LIVSHITS.   Spectroscopy equipment was heavily regulated by the U.S. government to Russia and other countries due to its potential use in nuclear weapons development.

(c)     On July 1, 2019, the Strandway LLC Account received $39,900 from Majory LLP.   Within two days, $39,650 had been disbursed, with $26,500 to a technology company specializing in dual-use sonar and hydrophone equipment used for sea navigation and avionics.

(d)     On July 31, 2019, the Strandway LLC Account received $18,550 from Majory LLP.   That same day, LIVSHITS sent $18,500 to a Colorado-based technology and research development company ("U.S. Company 3"), an entity the identity of which is known to the Grand Jury.

(e)     On October 6, 2020, Photon Pro LLP sent $19,810 to LIVSHITS at the Strandway LLC Account.

(f)     On October 25, 2019, the Strandway LLC Account received $67,445 from an Invention Bridge SL account.   By November 13, 2019, $66,700 had been disbursed to various entities, including Web Force Communications, Advanced Web Services LLC and other accounts in the names of LIVSHITS and his agents and nominees.

45.     The defendants and their co-conspirators used the U.S. Bank Accounts, including the Strandway LLC Account, to make numerous purchases of dual-use technologies from the U.S. Companies, including payments for oscilloscopes, signal generators, spectroscopy equipment, navigation and avionics components, and other items controlled under the EAR and other U.S. export control regulations.   For example, on or about December 12, 2020, the defendant BORIS LIVSHITS initiated a $9,900 payment from an account held at a U.S. financial technology company in the name of LIVSHITS and the front company Advanced Web Services.   According to a supporting document, the payment was for a dual-use oscilloscope controlled by the DOC under ECCN 3A992.a for reasons of anti-terrorism.   No export license was applied for or granted for this purchase.   Moreover, oscilloscopes typically cost far more than $9,900.   Notably, the IRS maintained a transaction reporting requirement providing that any person who, during trade or business, received more than $10,000 in a single transaction was required report the transaction to the IRS.

VII.    Falsified and Illicit Shipments Through the New Hampshire Residence

46.     In furtherance of transactions on behalf of the Serniya Network, the defendant BORIS LIVSHITS and the defendant ALEXEY BRAYMAN repeatedly used the New Hampshire Residence as a transshipment point for repackaging sensitive military-grade and export-controlled items and forwarding them to intermediate locations in Europe and Asia, from where they were transshipped to Russia.   In doing so, LIVSHITS and BRAYMAN used the New Hampshire Residence as an address of record for Strandway LLC, and falsely listed Strandway LLC and the New Hampshire Residence as the end users of export-controlled items.

47.     For example, on October 22, 2019, the defendant BORIS LIVSHITS emailed the defendant ALEXEY BRAYMAN: "[T]wo large boxes need to be sent . . . to Germany . . . It is necessary to cut off all old labels and remove all invoices and packing lists from the boxes that came with them originally.  Leave manuals and other technical documentation."  LIVSHITS attached shipping labels for a freight company in Hamburg, Germany, as well as numerous falsified invoices and end use statements.  One invoice documented that U.S. Company 3 purportedly sent a "Low Noise Cesium Frequency Synthesizer," valued at $44,965, to "Strandway LLC Attn: David Wetsky" at the New Hampshire Residence.  The "End Use Statement" listed "Strandway LLC," the New Hampshire Residence, the contact name "David Wetsky," and a contact email address "david.wetzky[@]awsresearch.net," along with the advisory, "[e]xport of these products is subject to the United States Government Export Administration Regulations (EAR)."  As described above, Strandway LLC and Advanced Web Services LLC were front companies used by LIVSHITS and the Serniya Network, and "David Wetsky" was a pseudonym used by LIVSHITS in furtherance of the scheme.

48.     In July 2022, the defendant BORIS LIVSHITS attempted to purchase for $15,564 a 3 GHz signal generator, controlled by the DOC under ECCN 3A992.a for reasons of anti-terrorism, from an Illinois-based test equipment company ("U.S. Company 4"), an entity the identity of which is known to the Grand Jury.  In an email dated July 25, 2022, LIVSHITS requested that an employee at U.S. Company 4 "please ship the generator to our NH address" for "Strandway LLC," and provided the address of the New Hampshire Residence.  LIVSHITS also provided U.S. Company 4 with a pro forma invoice and a Form BIS-711 ("Statement by Ultimate Consignee and Purchaser")—an end use statement filed

with the DOC—falsely listing Strandway LLC at the New Hampshire Residence as the "ultimate consignee and purchaser." The BIS-711 was signed by the defendant VADIM YERMOLENKO, who was listed as the "Director" of Strandway LLC, and certified that the signal generator would not be "reexported or incorporated into an end product."

49.    The defendant ALEXEY BRAYMAN made at least four shipments of sensitive electronic test equipment and other dual-use items from the New Hampshire Residence to Russia after March 31, 2022, after Sertal, Serniya and the defendant YEVGENIY GRININ were added to the SDN list. These deliveries contained oscilloscopes, signal generators and multimeters, and included the manufacturer and part number information, which reflected that they were all controlled by the DOC under ECCN 3A992.a. The shipments from the New Hampshire Address to a transshipment location in Hamburg, Germany used by the Serniya Network were as follows:

(a)    A multimeter on or about April 15, 2022;

(b)    An oscilloscope probe on or about April 15, 2022;

(c)    An oscilloscope on or about on May 6, 2022; and

(d)    A signal generator on or about May 10, 2022.

VIII.   The Purchase of Sensitive Testing Equipment

50.    In or about and between September 2019 and December 2020, the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS and SVETLANA SKVORTSOVA unlawfully purchased sophisticated testing equipment from a California-based laboratory device and components manufacturer ("U.S. Company 5"), an entity the identity of which is known to the Grand Jury. The defendants ultimately delivered

the items to a Russian end user, using the defendant ALEXEY BRAYMAN to transship the items through the New Hampshire Residence.

51.     On or about September 4, 2019, the defendant ALEXEY IPPOLITOV emailed the defendant YEVGENIY GRININ and another Serniya employee "urgently" requesting prices for several military-grade U.S.-origin items, including an analog signal generator, a spectrum analyzer, an electromagnetic simulation solver and spectral and pulse measurement devices.   GRININ then sent an email to the defendant SVETLANA SKVORTSOVA, with the message "let's break it down into parts" and suggested finding specific prices for each item.

52.     In or about July 2020, the defendant SVETLANA SKVORTSOVA sent an email to the defendant BORIS LIVSHITS requesting certain parts from U.S. Company 5.   After LIVSHITS provided price quotes, SKVORTSOVA forwarded the quotes to the defendant YEVGENIY GRININ.   On September 20, 2020, SKVORTSOVA instructed LIVSHITS to bill the front company Photon Pro LLP for the items.

53.     Packages pertaining to this shipment were then sent from U.S. Company 5 to the defendant ALEXEY BRAYMAN at the New Hampshire Residence, with shipping forms for each package falsely reflecting merchandise valued only at $2,640. However, the purchase prices each exceeded $15,000.   These packages were then forwarded by BRAYMAN to a transshipping point in Germany.

54.     On November 10, 2020, the defendant YEVGENIY GRININ emailed the defendant ALEKSEY IPPOLITOV the invoice for the order, along with shipping labels reflecting the packages' transshipment from Germany to GRININ in Russia.   On or about December 9, 2020, the defendant SVETLANA SKVORTSOVA emailed GRININ and

informed him that the items had been received in Russia by the end user, a major Russian university and scientific research facility that collaborated with Russia's defense sector on research and development projects.

IX.   The Purchase of a Military-Grade Spectrum Analyzer

55.     In or about and between February 2022 and April 2022, the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS and SVETLANA SKVORTSOVA unlawfully purchased a military-grade spectrum analyzer from a Florida-based electronics company ("U.S. Company 6"), an entity the identity of which is known to the Grand Jury.

56.     On February 18, 2022, the defendant BORIS LIVSHITS emailed an account executive at U.S. Company 6 and inquired about purchasing a military-grade spectrum analyzer, which could be used to measure electromagnetic signals on the battlefield or for countersurveillance operations and that was controlled by the DOC under ECCN 3A992.a for reasons of anti-terrorism.   LIVSHITS purchased the item for $14,065 and it was shipped to Strandway LLC and the defendant ALEXEY BRAYMAN at the New Hampshire Residence.

57.     In an email exchange occurring on or about March 6, 2022 and March 7, 2022, the defendant BORIS LIVSHITS attempted to have a Hong Kong-based freight forwarder send the item to Russia, saying, "I have a logistics task.   I need to ship [the spectrum analyzer] with DHL from US to Hong Kong to any company, which can receive it and then ship it via Emirate or Turkish air cargo to Russia – St. Petersburg or Moscow.   Can you do this?"   The freight forwarder refused LIVSHITS' request, citing the portfolio of international sanctions imposed on Russia after the invasion of Ukraine.

58.     On March 9, 2022, the defendant BORIS LIVSHITS sent the defendant ALEXEY BRAYMAN shipping labels and other documents, directing that the spectrum analyzer be sent from the New Hampshire Residence to a location in Hamburg, Germany used by the Serniya Network as a transshipment point.   Notably, the certificate of origin falsely claimed that the item originated in Malaysia, rather than in the United States.

59.     In an email exchange between the defendant BORIS LIVSHITS and an employee of U.S. Company 6 occurring on or about and between April 25, 2022 and April 27, 2022, LIVSHITS acknowledged that the spectrum analyzer was ultimately shipped to Russia—"I've finally received the [spectrum analyzer] I purchased from you in February, here in Russia"—and then complained that the device was not properly calibrated.   The U.S. Company 6 employee responded, "because of the sanctions and restrictions and our position in this industry and our contracts, I have been strongly cautioned not to speak with you anymore or have any dealings with your associates in the US."   LIVSHITS replied, "regarding sanctions, I've purchased this unit from you not as myself, but as a US company, with US shipping address.   Hence this transaction has nothing to do with Russian-related sanctions."

X.     The Attempts to Smuggle Electronics and Ammunition from Estonia

60.     On October 27, 2022, the defendant VADIM KONOSHCHENOK was stopped by police and border guard officers in Narva, Estonia, where he was attempting to cross from Estonia into Russia.   Inside of KONOSHCHENOK's vehicle were approximately 35 different types of semiconductors and other electronic components, several of which were of U.S.-origin and controlled by the DOC under ECCN 3A992.a for

reasons of anti-terrorism.   One of the items had been purchased by the defendant BORIS

LIVSHITS and shipped to KONOSHCHENOK on October 18, 2022.

      61.    Also secreted in KONOSHCHENOK's vehicle were thousands of

6.5mm bullets manufactured by a Nebraska-based firearms components and manufacturing

company.   The bullets were suitable for a sniper rifle and controlled under ECCN 0A505.x.

According to the Form BIS-711 documents filed with the DOC in accordance with the export

of the sniper rounds, these bullets had ostensibly been sold to Germany, Finland,

Luxembourg and Latvia but did not disclose their ultimate re-export to Russia.   Photographs

depicting some of the seized bullets are below:





62.     On November 24, 2022, the defendant VADIM KONOSHCHENOK

was again stopped by police and border guard officers in Narva, Estonia, where he was

attempting to cross from Estonia into Russia.   Inside of KONOSHCHENOK's vehicle were

approximately twenty cases of U.S.-origin bullets controlled under ECCN 0A505.x,

including tactical bullets and .338 military sniper rounds.

## COUNT ONE
(Conspiracy to Defraud the United States)

63.     The allegations contained in paragraphs one through 62 are realleged

and incorporated as if fully set forth in this paragraph.

64.     In or about and between January 2017 and December 2022, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS

SVETLANA SKVORTSOVA, VADIM KONOSHCHENOK, ALEXEY BRAYMAN and

VADIM YERMOLENKO, together with others, did knowingly and intentionally conspire to

defraud the United States by impairing, impeding, obstructing and defeating, through

deceitful and dishonest means, the lawful functions of OFAC and BIS, both agencies of the

United States, in the enforcement of economic sanctions laws and regulations, and the

issuance of licenses relating to export of goods and the provision of financial services.

65.     In furtherance of the conspiracy and to affect its objects, within the

Eastern District of New York and elsewhere, the defendants YEVGENIY GRININ,

ALEKSEY IPPOLITOV, BORIS LIVSHITS, SVETLANA SKVORTSOVA, VADIM

KONOSHCHENOK, ALEXEY BRAYMAN and VADIM YERMOLENKO, together with

others, committed and caused to be committed, among others, the following:

## OVERT ACTS

(a) On or about May 25, 2018, IPPOLITOV emailed GRININ a list of items to be procured for the National Research Nuclear University of the Moscow Engineering Physics Institute.

(b) On or about September 4, 2019, IPPOLITOV emailed GRININ about obtaining a "chip set" of 45 advanced semiconductors and other items from U.S. Company 1.

(c) On or about September 6, 2019, GRININ and SKVORTSOVA contacted LIVSHITS and requested a price quote for semiconductors and other comparable items from U.S. Company 1 and other U.S. Companies.

(d) On or about July 20, 2020, IPPOLITOV, GRININ and SKVORTSOVA received an email from an SVR official regarding an order.

(e) On or about September 20, 2020, SKVORTSOVA instructed LIVSHITS to bill Photon Pro LLP, a company controlled by GRININ, for items to be purchased from U.S. Company 5.

(f) On or about October 6, 2020, Photon Pro LLP, a company controlled by GRININ, sent $19,810 to the Strandway LLC Account, controlled by LIVSHITS.

(g) On or about November 10, 2020, GRININ emailed IPPOLITOV invoices and shipping labels.

(h) On or about December 12, 2020, LIVSHITS initiated a $9,900 payment from the Strandway LLC Account for an oscilloscope controlled under ECCN 3A992.a for reasons of anti-terrorism.

(i)     On or about February 8, 2022, LIVSHITS purchased a spectrum analyzer from U.S. Company 6 for $14,065.

(j)     On or about March 9, 2022, LIVSHITS sent BRAYMAN shipping labels, a certificate of origin and other falsified documents regarding a spectrum analyzer from U.S. Company 6 and directed BRAYMAN to send the spectrum analyzer to a location in Hamburg, Germany.

(k)     On or about April 26, 2022, YERMOLENKO opened an account in the name of "JJ Networks LLC" at a Bank 1 branch in New Jersey.

(l)     On or about April 27, 2022, YERMOLENKO deposited a check for $44,400.84 into an account in the name of "JJ Networks LLC" at a Bank 1 branch in New Jersey and immediately thereafter transferred $9,353 to Strandway LLC and $34,000 to Trailgate Systems, LLC, before withdrawing of the remaining balance in cash.

(m)     On or about July 26, 2022, LIVSHITS provided a pro forma invoice and a Form BIS-711 containing false information to U.S. Company 4.

(n)     On or about September 21, 2022, BRAYMAN sent a "Prototype Development Board with Case," which was controlled under ECCN 3A992.a, to KONOSHCHENOK in Estonia.

(o)     On or about October 27, 2022, KONOSHCHENOK attempted to transport U.S.-origin electronic components controlled under ECCN 3A992.a and bullets controlled under ECCN 0A505.x from Estonia to Russia.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT TWO
(Conspiracy to Violate IEEPA)

66.     The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

67.     On or about and between March 31, 2022 and December 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS and SVETLANA SKVORTSOVA, together with others, did knowingly and willfully conspire to violate the IEEPA, contrary to 50 U.S.C. § 1705, Executive Order 13848 and 31 C.F.R. §§ 579.203-204.

68.     It was a part and an object of the conspiracy that the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS and SVETLANA SKVORTSOVA, together with others, knowingly and willfully violated the IEEPA, and the regulations promulgated thereunder, to wit: GRININ, IPPOLITOV, LIVSHITS, SKVORTSOVA, and their co-conspirators knowingly and willfully caused U.S. persons, entities and financial institutions to provide funds, goods and services to and for the benefit of Serniya and Sertal, and caused U.S. persons, entities and financial institutions to receive funds, goods and services from Serniya and Sertal without first obtaining the required approval of OFAC, contrary to Executive Order 13692 and 31 C.F.R. §§ 591.101, 591.201- 591.202.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United States Code, Sections 3551 et seq.)

## COUNT THREE
(Bank Fraud Conspiracy)

69.     The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

70.     In or about and between January 2017 and September 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS, SVETLANA SKVORTSOVA, ALEXEY BRAYMAN and VADIM YERMOLENKO, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Bank 1, Bank 2, Bank 3 and Bank 4, entities the identities of which are known to the Grand Jury, contrary to Title 18, United States Code, Section 1344(1).

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT FOUR
(Wire Fraud Conspiracy)

71.     The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

72.     In or about and between January 2017 and December 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS, SVETLANA SKVORTSOVA, ALEXEY BRAYMAN and VADIM YERMOLENKO, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more U.S. companies, to wit: U.S. Company 1, U.S. Company 2, U.S. Company 3, U.S. Company 4, U.S. Company 5 and U.S. Company 6, by means of one

or more materially false and fraudulent pretenses, representations and promises, and for the

purpose of executing such scheme and artifice, to transmit and cause to be transmitted by

means of wire communication in interstate and foreign commerce, writings, signs, signals,

pictures and sounds, to wit: electronic communications, emails and other online

communications and monetary transfers in and through the Eastern District of New York and

elsewhere, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNTS FIVE THROUGH EIGHT
(Wire Fraud)

73.    The allegations contained in paragraphs one through 62 are realleged

and incorporated as if fully set forth in this paragraph.

74.    On or about the dates set forth below, all dates being approximate and

inclusive, within the Eastern District of New York and elsewhere, the defendants

YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS and SVETLANA

SKVORTSOVA, together with others, did knowingly and intentionally devise a scheme and

artifice to defraud one or more U.S. companies to wit: U.S. Company 1, U.S. Company 2,

U.S. Company 3, U.S. Company 4, U.S. Company 5 and U.S. Company 6, and to obtain

money and property from said companies and financial institutions by means of materially

false and fraudulent pretenses, representations and promises, and, for the purpose of

executing such scheme and artifice, transmitted and caused to be transmitted one or more

writings, signs, signals, pictures and sounds by means of wire communication in interstate

and foreign commerce, to wit: the wire transmissions set forth below:

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission |
|-------|----------------------------------------|----------------------------------|
| FIVE | September 13, 2018 | $43,900 wire transfer from a Majory LLP account in the United Kingdom to the Strandway LLC Account in the Eastern District of New York |
| SIX | July 1, 2019 | $39,900 wire transfer from a Majory LLP account in the United Kingdom to the Strandway LLC Account in the Eastern District of New York |
| SEVEN | October 16, 2019 | $12,830 wire transfer from the Strandway LLC account in the Eastern District of New York to U.S. Company 3 |
| EIGHT | October 7, 2020 | $14,344 wire transfer from the Strandway LLC account in the Eastern District of New York to U.S. Company 5 |

(Title 18, United States Code, Sections 1343 and 3551 et seq.)

COUNT NINE
(Money Laundering Conspiracy)

75.     The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

76.     In or about and between January 2017 and December 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS, SVETLANA SKVORTSOVA, ALEXEY BRAYMAN and VADIM YERMOLENKO, together with others, did knowingly and intentionally conspire to:

(a)     transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States and to one or more places in the United States from and through one or more places outside the United States, (i) with the intent to promote the carrying on of one or more specified unlawful activities, to wit: conspiracy to violate IEEPA, conspiracy to commit wire

fraud and wire fraud as charged in Counts Two and Four through Eight, all contrary to Title

18, United States Code, Section 1956(a)(2)(A); and (ii) which transactions in fact involved

the proceeds of unlawful activity, to wit: conspiracy to violate IEEPA, conspiracy to commit

wire fraud and wire fraud as charged in Counts Two and Four through Eight, knowing that

the monetary instruments and funds involved in the transportation, transmission and transfer

represented the proceeds of said unlawful activity, and knowing that such transportation,

transmission and transfer was designed in whole and in part to conceal and disguise the

nature, the location, the source, the ownership and the control of the proceeds of said

specified unlawful activity, all contrary to Title 18, United States Code, Section

1956(a)(2)(B)(i); and

        (b)     engage in one or more monetary transactions within the United

States in criminally derived property of a value greater than $10,000 that was derived from

one or more specified unlawful activities, to wit: conspiracy to violate IEEPA, conspiracy to

commit wire fraud, and wire fraud as charged in Counts Two and Four through Eight, all

contrary to Title 18, United States Code, Section 1957(a).

        (Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### COUNTS TEN THROUGH THIRTEEN
(Money Laundering)

77.    The allegations contained in paragraphs one through 62 are realleged

and incorporated as if fully set forth in this paragraph.

78.    On or about and between the dates set forth below, all dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS and

SVETLANA SKVORTSOVA, together with others, did knowingly and intentionally engage in monetary transactions, in and affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000, in the approximate amounts set forth below, and that was derived from one or more specified unlawful activities, to wit: conspiracy to violate IEEPA, conspiracy to commit wire fraud and wire fraud as charged in Counts Two and Four through Eight:

| Count | Approximate Date | Description of Wire Transmission |
|---|---|---|
| TEN | January 4, 2019 | $18,300 wire transfer from a Majory LLP account in the United Kingdom to the Strandway LLC Account in the Eastern District of New York |
| ELEVEN | July 31, 2019 | $18,550 wire transfer from a Majory LLP account in the United Kingdom to the Strandway LLC Account in the Eastern District of New York |
| TWELVE | October 25, 2019 | $67,445 wire transfer from an Invention Bridge SL account in Spain to the Strandway LLC Account in the Eastern District of New York |
| THIRTEEN | October 6, 2020 | $22,632 wire transfer from a Photon Pro LLP account in Austria to the Strandway LLC Account in the Eastern District of New York |

(Title 18, United States Code, Sections 1957(a), 1957(b), 1957(d)(1), 2 and 3551 et seq.)

## COUNT FOURTEEN
### (Conspiracy to Violate ECRA)

79.     The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

80.     In or about and between August 13, 2018 and December 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS

LIVSHITS, SVETLANA SKVORTSOVA, VADIM KONOSHCHENOK, ALEXEY

BRAYMAN and VADIM YERMOLENKO, together with others, did knowingly and

willfully conspire to violate and to cause one or more violations of licenses, orders,

regulations and prohibitions issued under the Export Control Reform Act.

81.     It was a part and an object of the conspiracy that the defendants

YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS, SVETLANA

SKVORTSOVA, VADIM KONOSHCHENOK, ALEXEY BRAYMAN and VADIM

YERMOLENKO together with others, would and did agree to export and cause to be

exported from the United States to Russia items on the Commerce Control List set forth in

Title 15, Code of Federal Regulations, part 774, Supplement Number 1, without having first

obtained a license for such export from the U.S. Department of Commerce.

(Title 50, United States Code, Sections 4819(a)(1), 4819(a)(2)(A)·(G) and

4819(b); and Title 15, Code of Federal Regulations, Sections 736.2(b)(1) and 746.8(a)(1))

## COUNT FIFTEEN
(Smuggling Goods from the United States)

82.     The allegations contained in paragraphs one through 62 are realleged

and incorporated as if fully set forth in this paragraph.

83.     In or about and between January 2017 and December 2022, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS,

SVETLANA SKVORTSOVA, VADIM KONOSHCHENOK, ALEXEY BRAYMAN and

VADIM YERMOLENKO, together with others, did knowingly and fraudulently export and

send from the United States, merchandise, articles and objects, to wit: items on the

Commerce Control List set forth in Title 15, Code of Federal Regulations, part 774,

Supplement Number 1, contrary to United States laws and regulations, to wit: Title 50,

United States Code, Section 4819(a)(1), 4819(a)(2)(A)-(G) and 4819(b) and Title 15, C.F.R.

§§ 736.2 and 746.8(a)(1), and did fraudulently and knowingly receive, conceal and facilitate

the transportation and concealment of such merchandise, articles and objects, prior to

exportation, knowing the same to be intended for exportation contrary to such United States

laws and regulations.

(Title 18, United States Code, Section 554(a), 2 and 3551 et seq.)

COUNT SIXTEEN
(Failure to File Electronic Export Information)

84.     The allegations contained in paragraphs one through 62 are realleged
and incorporated as if fully set forth in this paragraph.

85.     In or about and between January 2017 and December 2022, both dates
being approximate and inclusive, within the Eastern District of New York and elsewhere, the
defendants YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS and
SVETLANA SKVORTSOVA, together with others, did knowingly and willfully fail to file
and cause the failure to file electronic export information through the Automated Export
System relating to the transportation of electronic items and devices that had a value of more
than $2,500 from the United States to the Russian Federation.

(Title 13, United States Code, Section 305(a)(1); Title 18, United States Code,
Sections 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS TWO AND FIFTEEN

86.　　The United States hereby gives notice to the defendants that, upon their conviction of either of the offenses charged in Counts Two and Fifteen, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds traceable to such offenses.

87.　　If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

　　　　　　　(a)　　cannot be located upon the exercise of due diligence;

　　　　　　　(b)　　has been transferred or sold to, or deposited with, a third party;

　　　　　　　(c)　　has been placed beyond the jurisdiction of the court;

　　　　　　　(d)　　has been substantially diminished in value; or

　　　　　　　(e)　　has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

　　　　　(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS THREE THROUGH EIGHT

88.    The United States hereby gives notice to the defendants that, upon their

conviction of any of the offenses charged in Counts Three through Eight, the government

will seek forfeiture in accordance with: (a) Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person

convicted of such offense to forfeit any property, real or personal, which constitutes or is

derived from proceeds traceable to such offenses; and/or (b) Title 18, United States Code,

Section 982(a)(2), which requires any person convicted of such offenses to forfeit any

property constituting, or derived from, proceeds obtained directly or indirectly as a result of

such offenses.

89.    If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

       (a)    cannot be located upon the exercise of due diligence;

       (b)    has been transferred or sold to, or deposited with, a third party;

       (c)    has been placed beyond the jurisdiction of the court;

       (d)    has been substantially diminished in value; or

       (e)    has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS NINE THROUGH THIRTEEN

90.     The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts Nine through Thirteen, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property.

91.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

43

other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT FOURTEEN

92.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Fourteen, the government will seek forfeiture in accordance with Title 50, United States Code, Section 4819(d)(1), which requires any person convicted of such offense to forfeit any of the person's property (a) used or intended to be used, in any manner, to commit or facilitate the offense; (b) constituting or traceable to the gross proceeds taken, obtained or retained, in connection with or as a result of the offense; and/or (c) constituting an item or technology that was exported or intended to be exported in violation of the Export Control Reform Act.

93.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 50, United States Code, Section 4819(d)(2), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

       (Title 50, United States Code, Sections 4819(d)(1) and 4819(d)(2); Title 21, United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT SIXTEEN

94.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Sixteen, the government will seek forfeiture in accordance with Title 13, United States Code, Section 305, which requires any person convicted of such offense to forfeit any of the person's (a) interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of the violation; (b) interest in, security of, claim against, or property or contractual rights of any kind in tangible property that was used in the export or attempt to export that was the subject of the violation; and/or (c) property constituting, or derived from, any proceeds obtained directly or indirectly as a result of the violation.

95.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

      (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

      (Title 13, United States Code, Section 305; Title 21, United States Code, Section 853(p))

      A TRUE BILL

_Deighton Reid_
      FOREPERSON

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: 2019R01707
FORM DBD-34
JUN. 85

No. 22-CR-409 (S-1) (HG)

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

### THE UNITED STATES OF AMERICA

*vs.*

YEVGENIY GRININ, ALEKSEY IPPOLITOV, BORIS LIVSHITS, SVETLANA SKVORTSOVA, VADIM
KONOSHCHENOK, ALEXEY BRAYMAN and VADIM YERMOLENKO.

Defendants.

# SUPERSEDING INDICTMENT

(T. 13, U.S.C., § 305(a)(1); T. 18, U.S.C., §§ 371, 554, 981(a)(1)(C), 982(a)(1), 982(a)(2), 982(b)(1), 1343, 1349, 1956(h), 1957(a), 1957(b), 1957(d)(1), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C. § 2461(c); T. 50, U.S.C., §§ 4819(a)(1), 4819(a)(2)(A)-(G), 4819(b), 4819(d)(1), 4819(d)(2), 1705(a) and 1705(c); T. 15, C.F.R., §§ 736.2(b)(1)and 746.8(a)(1))

*A true bill.*

_____Deighton Reed_____
                    *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                        *Clerk*

*Bail, $*

*Arie McConnell, Assistant U.S. Attorney (718) 254-7150*